UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

WESLEY ANDERSON,

     Plaintiff,

                           **Case No. 1:17–cv–327**

     v.                    **JUDGE DOUGLAS R. COLE**

RICHARD K. JONES,
*et al.*,

     Defendants.

## OPINION AND ORDER

This § 1983 action is before this Court on the Motion for Summary Judgment (Doc. 44) by Defendants Richard K. Jones, Jimmy Combs, and Kate Fryer (collectively "Defendants"), and Defendants' Objection pursuant to Fed. R. Civ. P. 56(c)(2) (Doc. 48) to Plaintiff's use of certain statements by Plaintiff's expert witness, Michael A. Berg. The Court held a hearing on both the Motion and the Objection on January 27, 2020. For the following reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment and **SUSTAINS in PART** and **OVERRULES in PART** Defendants' Objection.

## I.    FACTS & BACKGROUND

### A.    Butler County Jail.

Defendant Richard K. Jones ("Sheriff Jones") is the elected Sheriff of Butler County, Ohio. (Defs.' Proposed Stipulated Facts ("Defs.' Stip. Facts"), ¶ 1, Doc. 44-1, #1014[1]). (*See also* Pl.'s Resp. to Defs.' Stip. Facts ("Pl.'s Resp. to Facts"), ¶ 1, Doc. 47-

---

[1] Pin citations are to the corresponding PageID number.

1, #1221). Kate Fryer ("Officer Fryer") and Jimmy Combs ("Officer Combs") were employed as Corrections Officers by the Butler County Sheriff's Office ("BCSO") during the time relevant to this action. (Defs.' Stip. Facts at ¶¶ 2–3, #1014). They are both certified Corrections Officers, and Officer Fryer has an Associate degree in criminal justice. (*Id.* at ¶¶ 4–5, 60, #1014, 1021). Both officers worked at the Butler County Jail (the "Jail").

Butler County Jail protocol requires corrections officers, after booking an arriving inmate, to classify him or her. The classification dictates the inmate's security level and housing assignment. (*Id.* at ¶¶ 15–16, #1016). Butler County Jail has maximum, medium, and minimum-security housing pods, plus a medical pod ("F-Pod") for inmates on suicide watch or with medical or mental health issues. (*Id.* at ¶ 19). Once classified, inmates are housed in pods according to their security level and in consideration of any medical or mental health needs. (*Id.* at ¶ 18).

BCSO maintains multiple policies and makes use of several forms to guide corrections officers through the classification process. (*Id.* at ¶ 21; *see* Berg Dep. Ex. 1, "Receiving a New Prisoner," Doc. 45-1, #1030–38; Berg Dep. Ex. 2, "Initial Screening Form," Doc. 45-2, #1039–41; "Classifying Incoming Inmates," Doc. 42-12, #955–66). Corrections officers elicit information from new arrivals using a "Classification Tree" as part of an inmate's classification interview. (Defs.' Stip. Facts at ¶ 50, #1019–20; Pl.'s Resp. to Facts at ¶ 50, #1225). The Classification Tree asks for certain information, including the inmate's charge, status, prior criminal history, escape risk, pending charges or warrants, and history of problems while incarcerated.

(Defs.' Stip. Facts at ¶ 50, #1019–20). This information aids officers in classifying inmates. If officers are unable to make a classification because an inmate is potentially under the influence of drugs or alcohol, the inmate is placed in "passive waiting," a cell within the booking area, for further observation. (*Id.* at ¶¶ 42–43, #1019).

If officers believe an inmate is suffering from mental illness at intake, they ask the Forensics team at the Jail to complete a mental health evaluation before assigning a housing unit. (*See id.* at ¶ 55–56, #1020). The Jail contracts with Transitional Living, Inc. to provide these services. (*Id.* at ¶ 57). The Forensics team includes social workers, a supervisory social worker, a case coordinator, and a psychiatrist, none of whom are employees of BCSO or the Jail. (*Id.* at ¶ 58). This team provides suicide/homicide risk assessments, crisis counseling, medication screening, and may recommend housing placement screens. (*Id.* at ¶ 59, #1020–21). They also provide other services to staff and inmates, including mental illness and suicide prevention training, maintaining a crisis phone line, completing walk-throughs in each housing unit to provide inmate access, and providing input regarding inmate housing issues. (*Id.*).

If the Forensics team or corrections officers deem it necessary, they may recommend placing an inmate in F-Pod for monitoring. This pod is designated as the medical and mental health pod, and it is staffed with two corrections officers. (*Id.* at ¶¶ 69, 71, #1022). F-Pod is also where the Forensics team's office is located. (*Id.* at

¶ 72). This permits inmates with mental or medical needs to be closer to the Forensics staff. (*Id.* at ¶ 73).

**B. Butler County Jail Intake on May 14–15, 2015.**

On May 15, 2015, Plaintiff Wesley Anderson ("Anderson") was arrested and charged with domestic violence. (Defs.' Stip. Facts. at ¶ 10, #1015). Officer Fryer, who was working as the third-shift booking officer at the Jail, booked Anderson into the facility at approximately 1:26 a.m. (*Id.* at ¶¶ 12–13). In her capacity as booking officer, she recorded certain information including Anderson's name, age, address, and basic medical information. (*Id.* at ¶ 14). Officer Monte Hackney ("Officer Hackney") then classified Anderson. (*Id.* at ¶ 20, #1016). During this process, Officer Hackney noted Anderson's current charge (domestic violence), status (pre-sentence), prior prison history (none), prior felony convictions (none), known enemies within the prison or gang affiliations (none), and any pending charges, warrants, or holders (none). (*Id.* at ¶ 25, #1017). Officer Hackney noted Anderson had a laceration on the back of his head and an injury to his right leg. (*Id.*). He classified Anderson as medium security. (*Id.* at ¶ 26). Officer Hackney provided a short classification narrative restating this information. (*Id.* at ¶ 27). The narrative states Anderson's paperwork was complete, and because of his leg injury, he was to be housed in "'F' block" for medical observation, assigned to cell six. (*Id.* at ¶¶ 28, 79, #1017, 1023; "May 15, 2015 Jail Incident Report," Doc. 43-3, #983).

Just prior to Anderson's arrival, on May 14, 2015, at approximately 10:28 p.m., Gregory Nicholas Payne ("Payne") was also booked into the Jail on a nonviolent

burglary charge. (Defs.' Stip. Facts at ¶ 29, #1017). Officer Fryer was also involved in Payne's intake process. (*See* Pl.'s Resp. to Facts at ¶ 30, #1223). At her deposition, Officer Fryer testified Payne was initially calm and compliant. (*Id.* at ¶ 33, #1224). After an incident in which Payne was non-compliant with a command and had to be tackled by a corrections officer, Officer Fryer placed Payne in a "passive waiting" cell so he could be observed before being classified, as she was concerned he might be under the influence of drugs or alcohol. (Defs.' Stip. Facts at ¶¶ 41–42, #1019). While in passive waiting, Payne went to sleep and slept through the end of Officer Fryer's shift, 7:00 a.m. on May 15th. (*Id.* at ¶ 44). At this point, Officer Fryer left the Jail and Officer Brandon Benjamin ("Officer Benjamin") began his shift as a classification officer. (*Id.* at ¶ 46).

Officer Benjamin eventually obtained the necessary additional information to complete Payne's classification. (*Id.* at ¶ 48; Pl.'s Resp. to Facts at ¶ 48, #1225). Officer Benjamin classified Payne as medium security. (Defs.' Stip. Facts at ¶ 51, #1020). Officer Benjamin noted Payne acted oddly while answering questions, which prompted him to refer Payne to the Forensics team. (*Id.* at ¶¶ 53–54). Payne remained in the booking area. (*Id.* at ¶ 56). Eventually Ms. Stacy Arbino, a Transitional Living, Inc. employee, arrived to evaluate Payne. (*Id.* at ¶¶ 60–62, #1021). The two discussed his difficulties during the intake process, his feelings of anxiety, and concerns about his homelessness. (*Id.* at ¶¶ 65–67, #1021–22). Payne did not display any violent tendencies toward Ms. Arbino, but she recommended Payne

be placed in F-Pod so he could be monitored; she did not recommend single-cell placement. (*Id.* at ¶¶ 68–69, 74–75, #1022).

After this evaluation, Officer Benjamin completed Payne's classification narrative noting his current charge (burglary), prior prison history (none), prior felony convictions (none), known enemies, gang affiliations, or racial issues (none), and that he appeared to have mental health issues. (*Id.* at ¶ 76, #1022–23). Payne was classified as medium security and assigned to F-Pod. (*Id.* at ¶ 79, #1023).

### C.     Anderson and Payne in F-Pod Cell Six.

At approximately 1:17 p.m. on May 15, 2015, nearly twelve hours after Anderson's arrival at the Jail, Payne was also placed in F-Pod cell six. (Defs.' Stip. Facts at ¶¶ 78–79, #1023). The two did not previously know each other, this was their first interaction, and they did not speak to each other. (*Id.* at ¶¶ 80–82). But Anderson was not afraid of Payne, Payne did not threaten Anderson, and Anderson did not complain about Payne. (*Id.* at ¶¶ 83–85).

Officers, for the duration of their shift, log activity in the Jail's computerized inmate-management system, "Vision Jail." (*Id.* at ¶ 88, #1024; Pl.'s Resp. to Facts at ¶ 88, #1227). On May 16, 2015, Defendant-Officer Jimmy Combs ("Officer Combs") and Officer George Coleman ("Officer Coleman") were assigned to work first shift in F-Pod; Combs' first notation in Vision Jail was at 7:11 a.m. (Defs.' Stip. Facts at ¶¶ 86–87, #1023; Combs Dep., 76–77, 79, Doc. 42-9, #797–98, 800). Jail policies regulate an officer's shift activities, including how they conduct rounds, which are to occur "at least every 40 minutes." (Berg. Dep. Ex. 7, "Start of Shift Post Order HOU-

02," Doc. 45-7, #1055–57; *see also* Berg. Aff., Ex. A, Doc. 45-9, #1069–71 (reviewing "General Housing Assignments, Order Number CLAS-04")). The May 16, 2015 Vision Jail reports for the first shift state that officers performed multiple security rounds (although admittedly not always at the "once at least every 40 minutes" standard specified by Jail rules). (Vision Jail Log, Doc. 42-10, #836–37, 839).

There were no reported issues in F-Pod during rounds or during meal delivery on May 16th. (Defs.' Stip. Facts at ¶ 89, #1024). Near the end of the first shift, F-Pod was placed in lockdown. Officer Combs completed entries into Vision Jail for end-of-shift logs, and Officer Coleman completed the last round, which included a safety check and inmate headcount. (*Id.* at ¶¶ 90–92). At the time of his safety check, Anderson and Payne were both lying in their respective beds. (*Id.* at ¶ 93). Officer Combs' final entry for the shift occurred at 2:31 p.m., and indicated "round completed, all secure … ." (Vision Jail Log, Doc. 42-10 at #839).

Approximately 17 minutes later, at 2:48 p.m., Payne attacked Anderson. (Berg Dep. Ex. 8, "Jail Incident Report 5/16/2015," Doc. 45-8, #1059). Officer Combs reports that he heard "a shout of help." (*Id.*). Officer Coleman, who was out in the pod, immediately began scanning cells in F-Pod to determine where the shout originated, while Officer Combs remained at the podium to open a cell door, if necessary. (Defs.' Stip. Facts at ¶¶ 96–97, #1024). Within seconds, Officer Coleman determined the shouting was coming from cell six. (*Id.* at ¶ 98, #1025). Officer Coleman observed Payne standing in the cell door and Anderson lying injured on the cell floor. (*Id.* at ¶ 99). Officer Coleman alerted Officer Combs to the situation and both officers

responded. (*Id.* at ¶¶ 100–01). They called a medic and a sergeant; Officer Coleman manually unlocked cell six, handcuffed Payne, and began to assist Anderson until medics arrived. (*Id.* at ¶¶ 102–04, 108). Neither officer witnessed the assault. (*Id.* at ¶ 105).

Anderson was transported out of the Jail to a hospital for treatment. Payne was reclassified as maximum-security, isolated from all other inmates, and assigned to an individual cell. (*Id.* at ¶ 109–10, #1026). Payne ultimately was charged with and convicted of felonious assault for his attack on Anderson. (*Id.* at ¶ 113).

On May 15, 2017, Anderson sued, asserting Officer Combs, Officer Fryer, and Sheriff Jones violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. (Compl., Doc. 1, ¶ 1, #2). Specifically, Anderson claims these individuals failed to protect him from the assault during his incarceration at the Jail. (*Id.*). As a result of the assault, Anderson alleges he was "severely injured," suffering "a depressed skull fracture, fractures to his sinus and orbital bones, conjunctival hemorrhage, and contusions of the face, scalp, neck, and foot." (*Id.* at ¶ 32, #6–7). He also claims he continues to "endure pain and side effects," which caused him to miss "significant time from work." (*Id.* at ¶¶ 33, 34, #7).

Anderson advances five claims. The first four are based on 42 U.S.C. § 1983, and assert Eighth Amendment violations (as incorporated against the State through the Fourteenth Amendment) as the underlying constitutional violation. More specifically, the first count alleges an Eighth Amendment failure-to-protect claim, which he asserts against all three Defendants in both their official and individual

capacities. Counts two through four are brought solely against Sheriff Jones in his official capacity. These counts claim, through the use of one label or another—i.e., unconstitutional policies, inadequate training, or failure to supervise—that Sheriff Jones (and really, as these are official capacity claims, the County) violated the Eighth Amendment and should be liable for the harm Anderson suffered at the hands of Payne. Finally, the fifth count asserts a state law claim for intentional infliction of emotional distress against all Defendants. (*See* Compl. at ¶¶ 36–72, #7–11).

## II.    PENDING MATTERS

The two issues currently pending before this Court are Defendants' Motion for Summary Judgment (Doc. 44) and Defendants' related Objections Pursuant to Fed. R. Civ. P. 56(c)(2). (Doc. 48). As to the latter, Rule 56(c)(2) allows a party to object "that the material citied to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Defendants argue that eight statements in Plaintiff's brief, which purportedly reflect statements by Anderson's expert Michael A. Berg ("Berg"), are impermissible legal conclusions or are not based in fact. (Defs.' Obj., #1233). Defendants ask this Court to strike these statements from the record, as they "are incapable of being presented in a form that would be admissible evidence." *Id.* Plaintiff disagrees. (*See* Pl.'s Resp. to Defs.' Obj., Doc. 51, #1271–73).

In their Motion for Summary Judgment, on the other hand, Defendants argue all five of Plaintiff's claims fail as a matter of law, either on the merits, or (as to the § 1983 claims) on qualified immunity grounds. In other words, Defendants argue they did not violate Anderson's constitutional rights, but even if they are deemed to have

done so, that they are entitled to qualified immunity. They further claim that Anderson has failed to assert a viable intentional infliction of emotional distress claim, and in any event, that they have statutory immunity from this state law claim.

## III.    DISCUSSION

### A.    Standard of Review on Summary Judgment.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). But this Court must view the facts and draw all inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with significant probative evidence to support its claim. *Celotex,* 477 U.S. at 324; *Lansing Dairy,* 39 F.3d at 1347.

This Court does not have the responsibility to *sua sponte* search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n.,* 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.,* 980 F.2d 399, 404–06 (6th Cir. 1992). Rather, the burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). If the nonmoving party fails to make the necessary showing for an element upon which

it bears the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

As noted above, four of the five claims here involve alleged violations of 42 U.S.C. § 1983, which requires a two-step analysis on summary judgment. First, "[t]o state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).

Second, this Court must also address the question of qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, "[i]n determining whether the government officials in this case are entitled to qualified immunity, [this Court] ask[s] two questions: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the

time of the violation?" *Id.* at 538–39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

## B.    Defendants' Rule 56(c)(2) Objection.

Because the Rule 56(c)(2) objection goes to the question of what record materials this Court may consider in resolving the Motion for Summary Judgment, it starts with that objection. Under Rule 56(c)(2), expert testimony may "embrace[] an ultimate issue to be decided by the trier of fact" so long as the issue embraced is factual. *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (quoting Fed. R. Evid. 704(a)). The same is not true when an expert reaches a legal conclusion. While an expert may imply to a jury the factual opinion the expert believes the jury should reach, an expert offering an opinion on an ultimate legal issue risks invading the providence of the court. A "legal conclusion" includes expert opinions stated in terms which have "separate, distinct and specialized meaning in the law, different from that present in the vernacular." *Torres v. Cty. of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985). "If they do, exclusion is appropriate." *Id.*

Applying those principles here, "deliberate indifference" has a specialized—i.e., legal—meaning in the Eighth Amendment context, arguably different from that in common vernacular. *See Berry*, 25 F.3d at 1353 ("'Deliberate indifference' is a legal term … [and] it is the responsibility of the court, not testifying witnesses, to define legal terms."); *see also Torres*, 758 F.2d at 150–51. Thus, any statement by Berg that certain conduct constitutes "deliberate indifference" will not be considered by this Court. (*See* Berg Aff., Doc. 45-9 at ¶ 17, #1061–62) (opining that certain conduct is "a

result of the office's deliberate indifference to the constitutional obligation to protect inmates such as Wesley Anderson").

The problem with the Defendants' objection, though, is that it is not directed at Berg's statements, *per se*. Rather it is directed at various sentences from Anderson's opposition brief, most of which cite to Berg's statements, but at least one of which is pure argument. To the extent that these sentences from the briefing rely on opinions like the one identified above (*id*.), they fall outside the permissible bounds of Fed. R. Evid. 704(a), and this Court does not rely on them. But, based upon this Court's review, only Statement 2 of the eight cited statements in the Rule 56(c)(2) objection falls into that category (as it cites to ¶ 17, the paragraph from the Berg affidavit discussed above).

The remaining statements from the brief, to the extent that they rely on the Berg affidavit, appear to rely on statements in that affidavit that are not directed at issues like "deliberate indifference," but rather are directed at factual matters. Thus, they are not subject to the no-legal-opinions argument.

On a separate note, Defendants also attack the statements as not sufficiently grounded in fact. (Defs.' Obj., #1233). There is a difference at the summary judgment stage, though, between this Court striking statements which reach an impermissible legal conclusion and striking those which are factually questionable. A trial court has broad discretion to make admissibility rulings regarding expert opinion evidence, which are "sustained unless manifestly erroneous." *EQT Prod. Co. v. Phillips*, 767 F. App'x 626, 633 (6th Cir. 2019) (quoting *Brainard v. Am. Skandia Life Assur. Corp.*,

432 F.3d 655, 663 (6th Cir. 2005)). "Whether an affidavit should be stricken from the record and whether it is sufficient to defeat a motion for summary judgment are two different matters." *Morrison v. Bd. of Trs. of Green Twp.*, 529 F. Supp. 2d 807, 821 (S.D. Ohio 2007) (citing *Monks v. Gen. Elec. Co.*, 919 F.2d 1189, 1192–93 (6th Cir. 1990)). "Mere weakness in the factual basis of an expert witness' opinion … bear[s] on the weight of the evidence rather than its admissibility." *Id.* (citations and quotations omitted). Thus, this Court will not strike these statements.

At the same time, Berg's statements in the affidavit are "but one item of evidence" in determining whether Anderson meets his burden on summary judgment. And "admissibility of an expert's affidavit is distinct from … whether the affidavit is sufficient to withstand a summary judgment motion." *Monks*, 919 F.2d at 1192–93. Here, as further explained below, Berg's conclusory opinions do not cite any relevant factual underpinnings, and are insufficient to create a genuine issue of material fact as to Anderson's § 1983 claims.

## C.     Defendants' Motion for Summary Judgment.

The Eighth Amendment prohibitions on cruel and unusual punishment place a duty on prison officials to provide humane conditions of confinement and to take reasonable measures to guarantee inmate safety. *See, e.g.*, *Greene v. Bowles*, 361 F.3d 290, 296 (6th Cir. 2004). Attempting to recover under 42 U.S.C. § 1983 for a violation of these Eighth Amendment rights, Anderson pursues several related theories that fall into two general categories for analytical purposes.

*First*, Anderson alleges a failure to protect claim against Officers Fryer, Combs and Sheriff Jones, in both their individual and official capacities. (*See* Compl. at ¶¶ 36–43, #7–8 ("First Cause of Action")).

*Second*, Anderson's remaining three § 1983 claims are directed against Sheriff Jones in his official capacity. These claims allege that Sheriff Jones failed to train corrections officers (*id.* at ¶¶ 44–55, #8–9 ("Second Cause of Action")), implemented unconstitutional policies, practices, or customs within the Jail,[2] (*id.* at ¶¶ 56–61, #9–10 ("Third Cause of Action")) and failed to supervise the corrections officers (*id.* ¶¶ 62–68, #10–11 ("Fourth Cause of Action")). While these three claims bear slightly different labels, they share two common traits: (1) as official capacity claims, they are properly treated as claims against the Sheriff's employer (i.e., the County), rather than the Sheriff individually, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding official capacity § 1983 claims are claims against the official's office); and (2) through each, Anderson seeks to make the County liable based on its own alleged shortcomings in causing the Officers' alleged misconduct. In his summary judgment briefing, Anderson treats all three claims as different "flavors" of a single claim, and this Court likewise will do so here.

Separately, Anderson asserts a state law intentional infliction of emotional distress claim against Sheriff Jones and both Officers in their official and individual capacities (Compl. at ¶¶ 69–72, #11 ("Fifth Cause of Action")).

---

[2] This count is styled as a "Supervisory Liability" claim, but seems to allege "a widespread policy, practice or custom of disregarding adherence to proper intake procedures." It is therefore addressed as claimed, not as captioned.

For their part, Defendants argue that all the claims fail as a matter of law, and even if they do not, both the municipality and the individuals are entitled to qualified or state statutory immunity. This Court separately addresses below both categories of § 1983 claims, as well as the state law intentional infliction claim.

      **1.**      ***Officer Combs, Officer Fryer, and Sheriff Jones are Entitled to Summary Judgment on Anderson's Failure to Protect Claim.***

A failure-to-protect claim under the Eighth Amendment has both objective and subjective components. *See Farmer v. Brennan*, 511 U.S. 825, 835–38 (1994). To meet the objective component, Anderson must show exposure to "a substantial threat of serious harm." *Id.* at 837. To meet the subjective component, he must show facts establishing at least a genuine dispute: (1) that Officer Combs, Officer Fryer, and Sheriff Jones each "subjectively perceived facts from which to infer a substantial risk" to Anderson; (2) that each "did in fact draw the inference;" and (3) that each "then disregarded that risk." *Richko v. Wayne Cty.*, 819 F.3d 907, 915–16 (6th Cir. 2016). This Court concludes that Anderson cannot meet this high standard as to any defendant, albeit for somewhat different reasons as to each.

As to Sheriff Jones and Officer Combs, Anderson fails to create a genuine dispute as to whether either had awareness of any facts relating to Payne from which they could have inferred that Payne represented a "substantial risk" to Anderson. As to the first, Anderson concedes that Sheriff Jones did not have any involvement in any aspect of Payne's intake or placement in the facility (beyond his involvement in,

or responsibility for, training or supervising Corrections Officers, which is addressed separately below). (*See infra* Part III.C.2).

Anderson likewise concedes that Officer Combs, despite having worked in F-Pod during the shift when the assault occurred, did not have access to any facts showing that Payne presented a significant risk. Indeed, Anderson argues that one aspect of the constitutional deprivations visited upon him actually arose from the failure of other persons at the institution (some of whom Anderson did not name as defendants in this action) to provide such information to Officer Combs:

> Despite [Officer] Benjamin's claims that he informed the pod officer of everything he knew about Payne, [Officer] Combs denies ever being told that Payne: 1) displayed odd behavior at booking; 2) was believed to be on drugs; 3) wrote the wrong name and birthdate during the booking process; 4) appeared to be confused during the booking process; 5) tried to run away and needed to be tackled during the booking process; or 6) that Payne was believed to have a mental disability or mental health issues.

(Pl.'s Resp. in Opp'n to Summ. J. at #1029; *see also id.* ("As a result [of Officer Fryer's alleged shortcomings in processing Payne], Combs, as the pod officer accepting Payne, was *wholly unaware of these concerns.*") (emphasis added)). Having specifically asserted that Officer Combs was "wholly unaware of" such facts, Anderson can scarcely be heard to simultaneously argue that Officer Combs exhibited deliberate indifference—a standard that requires at a bare minimum a showing that Officer Combs ignored facts in his possession. In short, the failure-to-protect arguments against Sheriff Jones and Officer Combs are non-starters. Counsel for Anderson largely conceded as much at argument, and properly so.

The failure-to-protect claim against Officer Fryer stumbles on a different prong. In particular, she arguably had facts indicating that Payne presented some risk—after all, Payne ignored officers' instructions and had to be tackled during intake, and as a result of that and other behavioral cues, she thought he may be under the influence of drugs or alcohol. It is not entirely clear whether those observations would have been enough to make her subjectively aware of a "substantial risk," or whether she actually drew the conclusion that such a risk existed, but this Court need not reach that issue. That is because, on the undisputed facts, Anderson cannot make out a claim that Officer Fryer consciously disregarded that risk, the third element he must show. To the contrary, rather than assigning Payne to a cell, Officer Fryer placed him in a holding area for further observation. The decision to remove him from that observation area and place him in F-Pod in a shared cell was, as Anderson's counsel also conceded at argument, a discretionary decision by a different officer at a later time, after Officer Fryer's shift ended and she left the facility. Even if that later decision reflected conscious disregard of a risk (and there is no reason on the current record to believe that it did), that decision was the responsibility of the corrections officer who made it, not Officer Fryer. She did not expose Anderson to any meaningful risk, and certainly not a "substantial threat of serious harm," through her conduct, *see Farmer*, 511 U.S. at 837, which only amounted to placing Payne in a holding cell for observation.

Seeking to avoid this result, Anderson contends that Officer Fryer failed to make some of the requisite entries about Payne in the Vision Jail system. He asserts

this violated prison rules and claims that her failure may have ultimately contributed to Officer Combs not receiving the information down the road (and therefore placing Payne in the cell with Anderson). But, neither the Vision Jail software program, nor the prison rules, are ensconced in the Eighth Amendment. Nor, as Anderson's counsel conceded at oral argument, is there a private right of action for violation of the cited prison rules. All the Eighth Amendment requires of prison guards is that they act reasonably, or, more accurately, that they not act with deliberate indifference. There is simply no way that Officer Fryer's decision to place Payne in observation, even if she did not also document all of his conduct in Vision Jail, rises to that level. The undisputed facts show that she acted based on the information available to her, and that in doing so, she acted reasonably. That is not the stuff of an Eighth Amendment violation.

In sum, Anderson does not have a viable Eighth Amendment failure-to-protect claim against any of the three Defendants that he named in this lawsuit. Thus, this Court grants summary judgment to Defendants on that claim.

### 2. *Sheriff Jones is Entitled to Summary Judgment on Anderson's Official Capacity Claims.*

Counts Two, Three and Four of Anderson's complaint assert official capacity claims against Sheriff Jones. These are treated as claims against Butler County.[3] *See Will*, 491 U.S. at 71; *Campbell v. City of Springboro*, 788 F. Supp. 2d 637, 677 (S.D.

---

[3] Federal law indicates "municipal liability" includes "other political subdivisions such as counties and townships." *Baker v. Union Twp.*, No. 1:12-cv-112, 2013 WL 4502736, at *16 n.4 (S.D. Ohio Aug. 22, 2013) (citing *Peabody v. Perry Twp.*, No. 2:10-cv-1078, 2013 WL 1327026, at *19 n.1 (S.D. Ohio Mar. 29, 2013)).

Ohio 2011) (citing *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989)). It is well-settled that a political subdivision, such as Butler County, does not have *respondeat superior* liability under § 1983. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). But a political subdivision can be directly liable where a plaintiff "show[s] that the alleged federal right violation occurred because of a municipal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted). "'To show the existence of a [subdivision's] policy or custom leading to the alleged rights violation, a plaintiff can identify: (1) the [subdivision's] legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations.'" *Winkler v. Madison Cty.*, 893 F.3d 877, 901 (6th Cir. 2018) (quoting *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015)).

Here, Anderson asserts versions of categories three and four of the *Winkler* taxonomy. More specifically, he claims that Sheriff Jones failed to train (Count Three) and inadequately supervised (Count Four) his Corrections Officers, which appear to be *Winkler* category three claims. He also claims the County had a "practice or custom of disregarding adherence to proper intake procedures by Defendants and other BCSD staff" (Count Two), which appears to be a *Winkler* category four claim. The opinion addresses each of these below.

Before reaching the merits of those issues, though, this Court must first address a threshold issue. Can the County (i.e., the Sheriff in his official capacity) be

liable under § 1983 where no individual defendant is liable? The Sixth Circuit guidance on this issue is somewhat murky. In *Watkins v. City of Battle Creek*, the court stated that "if no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." 273 F.3d 682, 687 (6th Cir. 2001). A later concurrence by Chief Judge Cole in *Epps v. Lauderdale Cty.*, however, raised questions regarding the appropriate scope of that language. 45 F. App'x 332, 334–35 (6th Cir. 2002) (Cole, C.J., concurring). And, in *Winkler*, the Sixth Circuit noted the lack of clarity in its decisions on this topic, but determined it did not need to resolve the issue there: "We need not decide whether, under our court's precedent, a municipality's liability under § 1983 is always contingent on a finding that an individual defendant is liable for having committed a constitutional violation." 893 F.3d at 901.

It appears the Supreme Court and/or the Sixth Circuit may soon have an opportunity to resolve this question. *See Berry v. Delaware Cty. Sheriff's Office*, No. 19-3096, 2019 WL 6005661, at *2 n.1 (6th Cir. Nov. 14, 2019), *petition for cert. filed*, (U.S. Feb. 14, 2020) (No. 19-1014) (acknowledging *Winkler* but not resolving whether "finding a municipality liable under § 1983 requires proof that an individual defendant committed a constitutional violation") *and Brawner v. Scott Cty.*, No. 3:17-cv-00108, 2019 WL 2195234 (E.D. Tenn., May 21, 2019), *app. filed*, No. 19–5623 (6th Cir. June 11, 2019). In the interim, the answer remains unclear. But it very much matters here, as this Court has already determined that summary judgment is warranted on the individual § 1983 claims in this action. So, if individual liability

against a named defendant is a necessary prerequisite to official capacity liability against the County, summary judgment in the County's favor is warranted without any further consideration of the merits of the specific claims at issue.

Pending an authoritative determination by the Sixth Circuit or the Supreme Court, though, this Court concludes that a lawsuit need not include a valid claim against an individual defendant to make out a § 1983 violation against a political subdivision. After all, the Supreme Court made it clear in *Monell* that the political subdivision's liability is not derivative of an individual actor's liability. That is, the political subdivision is not facing derivative liability for someone else's conduct. Rather, the claim against the entity requires a plaintiff to show that the entity itself acted improperly—for example, by establishing an unconstitutional policy.

To be sure, in such cases, the harm will likely be visited upon the plaintiff by an agent of the entity that implements the policy, but it is the *policy*, not the agent's *action*, that gives rise to the constitutional violation by the entity. Thus there is no immediate reason why liability for the policymaker should turn on whether the plaintiff has also sued the specific actor. Indeed, as a general rule, there is no requirement that a plaintiff sue *all* of the joint tortfeasors who may have contributed to his or her injury. *See, e.g.*, *Temple v. Snynthes Corp.*, 498 U.S. 5, 7–8 (1990) (per curiam) ("[I]t is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."); *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 204 (6th Cir. 2001) ("[A] person's status as a joint tortfeasor does not make that person a necessary party, much less an indispensable party."). Certainly, no one here has cited this Court to

any caselaw adopting an all-tortfeasors-must-be-named rule in the § 1983 context. Thus, even if the policymaker and the policy implementer are akin to joint tortfeasors in a § 1983 action, there is no clear reason why a plaintiff must sue both. Accordingly, this Court concludes that, notwithstanding the lack of any viable claim against any named individual defendant, this Court must nonetheless consider the merits of Anderson's claims against the County, the topic to which this Court now turns.

### a. Sheriff Jones is Entitled to Summary Judgment on the Failure to Train Claims.

As noted above, one way a plaintiff may establish a claim against a political subdivision is by showing a policy of inadequate training. *Burgess v. Fischer*, 735 F.3d. 462, 478 (6th Cir. 2013). Anderson asserts such a claim here, but in doing so he faces a high hurdle: "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Berry*, 2019 WL 6005661 at *3 (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Only when a political subdivision's failure to train rises to the level of "deliberate indifference" does this failure become a "policy or custom that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Moreover, to substantiate his failure to train claim, Anderson must satisfy three separate elements: "(1) that a training program is inadequate to the tasks the officers must perform; (2) that the inadequacy is the result of the [official's] deliberate indifference; and (3) that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Harvey v. Campbell Cty.*, 453 F. App'x 557, 562 (6th Cir. 2011); *see Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (citing, among others, *Canton*, 489 U.S. at 389–91)).

i. ***Defendants are Entitled to Summary Judgment Because Plaintiff Cannot Demonstrate Officers were Inadequately Trained.***

A plaintiff must establish the inadequacy of the training, even if it is the defendant who moves for summary judgment. That is because a defendant is not required to "support their motion … with evidence negating plaintiffs' claim." *Harvey*, 453 F. App'x at 564. Moreover, with regard to the plaintiff's burden, a mere showing that the harm at issue could have been avoided through more training is insufficient, in and of itself, to show *inadequate* training. *See, e.g.*, *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (noting the plaintiff "cannot meet her burden of proof by showing … that harm could have been avoided if the nurse had better or more training") (quotations omitted). In other words, there must be some showing that the training fell below an objectively reasonable level, not merely a *post hoc* assumption that, because a harm occurred, the training was necessarily inadequate, or that more training would have led to a better result.

Similarly, the mere fact that a municipal employee is unfamiliar with a policy is insufficient, on its own, to create a genuine dispute as to whether the actor received inadequate training on the policy. For example, in *Harvey v. Campbell Cty.*, the plaintiffs claimed that the police officer defendants were inadequately trained regarding the use of force, based on the officers' "personal unfamiliarity" with department policies. 453 F. App'x 557, 565 (6th Cir. 2011). The district court found that sufficient to avoid summary judgment for the defendants on the inadequate training claim. *Id.* But according to the Sixth Circuit, "Plaintiffs would have us draw inferences that are not reasonably supported by record evidence … they cannot rely

merely on allegations and arguments, but must set out specific facts showing a genuine issue for trial." *Id.* This burden is, and remains, on plaintiffs. *See id.* at 566 ("The district court overlooked these shortcomings in plaintiffs' case, concluding that *defendants* had not met *their* burden. … The district court thus improperly excused plaintiffs from their burden of coming forward with specific facts demonstrating a triable fact issue.") (emphasis in original). It is Anderson's burden, even as the nonmoving party at summary judgment, to come forward with affirmative evidence of a failure to train.

Anderson does not point to any record evidence, other than events related to this one incident, that indicate BCSO either maintained or maintains a deficient training program or that it failed to train Officers Fryer or Combs. In essence, he asks this Court to infer such inadequacy from this one incident. That won't work. But, beyond the fact that the incident occurred, Anderson says nothing about the training that County corrections officers, either those at issue here or County corrections officers generally, actually received or should receive. And pointing to mere unfamiliarity with the rules, as Anderson does here, simply is not enough to avoid summary judgment. *See Harvey*, 453 F. App'x at 566. There must be something more.

In an effort to avoid summary judgment, Anderson relies heavily on his expert witness, Berg. But Berg does not provide an opinion suggesting that *any* officer was inadequately trained as a matter of course.[4] To be sure, Berg *does* opine regarding

---

[4] While there are several references to inadequate training and a failure to train, these generalizations and similarly reach legal conclusions, which this Court will not consider in its review of the record. (*See supra* Part III.B).

several individual instances in which he claims that officers failed to abide by jail policy, but an individual lapse in complying with a policy is not, in and of itself, necessarily indicative of a failure to train. And what Berg does *not* say is that any officer was inadequately trained. He does not state, for example, anything like "the recognized national standard is that Corrections Officers receive 30 to 40 hours of classification training that focuses on the use of the PREA Risk Assessment Form and the Classification Data Checklist, whereas Officer Fryer had none."[5] Indeed, Berg does not include, nor did he review, *any* BCSO personnel file or training records in preparing his expert report. (Berg. Aff., Ex. A, #1069–71). Accordingly, Anderson has failed to create a genuine dispute as to whether the training program here is "inadequate to the tasks the officers must perform." *Harvey*, 453 F. App'x at 562.

## ii. *Defendants are Entitled to Summary Judgment Because Anderson Cannot Demonstrate Defendants were "Deliberately Indifferent."*

Even if there were a question of fact regarding the adequacy of the training that BCSO provides to its officers, separately Anderson has failed to identify any record facts showing that the alleged inadequacy of the training reflects "deliberate indifference" on the County's part. The deliberate indifference standard is employed in "other contexts to define the threshold for finding a violation of the Eighth Amendment," but in failure-to-train cases, the term is used differently to identify "the threshold for holding a [political subdivision] responsible for the constitutional torts

---

[5] This Court is not suggesting that the offered statement is a true statement, but is rather providing the statement as an example of the type of opinion that may create a factual dispute on the adequacy of training.

committed by its inadequately trained agents."[6] *Collins v. City of Harker Heights*, 503 U.S. 115, 124 (1992) (citations omitted). "[D]eliberate indifference is a stringent standard of fault," that requires proof a "municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 63–64 (quotations omitted). A standard any lower would result in a reduction to "*de facto respondeat superior*," which the Supreme Court rejected in *Monell. Canton*, 489 U.S. at 392 (citing *Monell*, 436 U.S. at 693–94).

While high, the deliberate indifference threshold for an inadequate training claim can be met one of two ways. First, Anderson can establish a pattern of prior instances of unconstitutional conduct that should have illustrated (to the Sheriff, i.e., the County) the need for better training (a "pattern claim"); or second, he can demonstrate a single violation of federal rights coupled with "an obvious potential" that the violation was the result of a failure to train for recurring situations, which the County should have known the officer was likely to encounter (a "single event claim"). *Harvey*, 453 F. App'x at 562–63 (citations omitted).

Establishing a pattern of unconstitutional conduct is difficult because there must be a frequently recurring constitutional violation of a similar nature in advance of the violation at issue. *See Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 575 (6th Cir. 2016) (failing to find an established pattern because prior instances of animal shootings by police were not unconstitutional); *D'Ambrosio v. Marino*, 747 F.

---

[6] In other Eighth Amendment contexts, the term "deliberate indifference" is used to establish the "degree of fault (if any) that a plaintiff must show to make out an underlying claim of a constitutional violation." *Canton*, 489 U.S. at 388 n.8.

App'x 378, 387 (6th Cir. 2014) (failing to find an established pattern because the complaint was "limited to allegations regarding the repeated failures of only one" municipal employee); *Gregory v. Shelby Cty.*, 220 F.3d 433, 441–43 (6th Cir. 2000) (failing to find an established pattern, even though "the written policy was not followed on more than one occasion," as the prisoner failed to show the "lapse of compliance with the written policy was so well settled as to constitute a custom" to establish municipal liability). Anderson does not even attempt to meet the requirements for a pattern claim.

Rather, Anderson seeks to travel the second path—relying on a single event, the assault against him—to show that the County was deliberately indifferent to the likelihood of harm that would result from allegedly inadequate training. (Pl.'s Resp. at #1216). The problem he faces in that regard is that the single-event framework for establishing inadequate training as a basis for a § 1983 claims applies to an exceedingly "narrow range of circumstances," *Connick*, 563 U.S. at 63–64, and this case does not fall within that range.

The single-event framework arose out of the Supreme Court's decision in *Canton*. There, the Supreme Court hypothesized that single-event liability could arise, for example, if a city with an armed police force deployed officers into the public to arrest felons without training on the constitutional limits to using deadly force. *See Canton*, 489 U.S. at 390 n.10. The risk that constitutional violations may occur without such training, combined with the frequency with which officers would attempt to arrest fleeing felons, created a sufficiently obvious need for that specific

training that a single resulting violation could suffice to establish § 1983 liability without proof of a pre-existing pattern. *Id. But see Bryan Cty.*, 520 U.S. at 409–10 (noting *Canton* represented "a narrow range of circumstances, [where] a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations"); *Morningstar v. Worthy*, 454 F. App'x 391, 406 (6th Cir. 2011) (noting the single-event liability arises only where the rights violation "was a highly predictable, or plainly obvious, consequence of the City's failure to train"). In other words, where it should be "plainly obvious" that a certain situation will call for some specific training in order to avoid constitutional violations, and it is similarly "plainly obvious" that the situation is likely to arise for a given officer, *Morningstar*, 454 F. App'x at 406, the failure to provide the specific training to the officer may give rise to an inference of deliberate indifference on the subdivision's part, and thus may constitute a § 1983 violation, even in the absence of a pattern of violations.

In essence, then, a pattern claim amounts to an assertion along these lines—a political subdivision has seen a certain constitutional violation happen often enough that it should be aware of the need to train. A single-event claim, by contrast, amounts to an assertion that—the likelihood of this problem was so obvious that any reasonable actor in the political subdivision's place would have been aware of the need for specific training on this issue, even before the first violation arose.

Having created the possibility of a single-event framework in *Canton*, though, the Court's later decision, *Connick v. Thompson*, illustrated just how narrow that

framework is. 563 U.S. 51, 67 (2011). *Canton* assumed that, without training, "armed police officers have no knowledge at all of the constitutional limits on the use of deadly force." *Id.* at 67. But, in *Connick*, when faced with the question of whether training prosecutors on evidentiary disclosure rules represented an equally obvious need, such that a single *Brady* violation could give rise to a failure-to-train claim, the Court said no, surmising that prosecuting attorneys were at least "familiar with the general *Brady* rule." *Id.* at 66–67. This familiarity, paired with a legal education and ongoing professional development, even without specific *Brady* Rule training, was sufficient to prevent a finding of deliberate indifference. *Id.* at 68. "Merely showing additional training would have been helpful in making difficult decisions" is not enough. *Id.* at 66–67; *see also Chumley v. Miami Cty.*, No. 3:14-cv-16, 2015 WL 859750, at *9–10 (S.D. Ohio Feb. 27, 2015) (finding no single event liability based on a violation of Fourth Amendment search requirements, as "all officers are trained on search warrant procedures as part of their basic academy training"). Absent an "obvious need for specific [] training" the *Canton* exception did not apply, and the political subdivision was not liable. *Id.*

Further compounding the difficulty for a plaintiff who is relying on the single-event framework, a court must also distinguish between instances where the violation occurred due to the actor's lack of adequate training (for which the political subdivision may be liable), as opposed to the actor's own failure *to follow* the training that he or she received in a given instance (which may give rise to individual liability for the actor, but would not be a basis for political subdivision liability). *See*, *e.g.*,

*Baker v. Union Twp.*, No. 1:12-cv-112, 2013 WL 4502736, at *20–22 (S.D. Ohio Aug. 22, 2013) (finding no single event liability in the face of an excessive force claim because even though the act "may show that the execution of a policy was improper, it does nothing to explain what training was or was not provided to officers or how that training was so inadequate it could not have prevented the constitutional violations").

In sum, if all the plaintiff has identified is a single instance of allegedly violative conduct—the one that affected him—he faces a high, nearly insurmountable, threshold in arguing that the single instance suffices to support a failure-to-train claim.

This case is not the rare case where an alleged need for more, and more specific, training was so "plainly obvious" that the County could be deemed "deliberately indifferent" without the plaintiff first establishing a pre-existing pattern of violations. Unlike *Canton*'s hypothetical, Anderson fails to show Officers Fryer or Combs lacked the basic training required to be corrections officers. Nor has Anderson shown that they lacked specific training regarding the proper procedures at BCSO, or that the training they received was so obviously inadequate it could not have prevented the harm which ultimately befell him. Indeed, BCSO had policies in place at the time of the attack, including policies for booking, classifying new detainees, beginning rounds, and conducting shifts during the workday. And to the extent that Anderson points to the alleged failure to follow such policies in this single instance, he runs directly into *Baker's* admonition that "[w]hile such a finding may show that the

execution of a policy was improper" it cannot serve as the sole basis for a failure-to-train claim. *See Baker*, 2013 WL 4502736 at *21. Accordingly, Anderson has failed to show any genuine dispute as to whether Sheriff Jones' alleged failure to train amounted to deliberate indifference.

Stated differently, there is neither a pattern of misconduct, nor a single-event claim that falls within *Canton's* narrow range. There is no reason that Sheriff Jones would have been expected to realize that more training was necessary, let alone any basis for inferring that Sheriff Jones deliberately disregarded the likelihood that the failure to provide such additional training would result in the deprivation of Anderson's constitutional rights. Accordingly, Sheriff Jones is entitled to summary judgment on this claim.

> **b.      Sheriff Jones is Entitled to Summary Judgment on Anderson's "Supervisory Liability" Claim.**

Anderson fares no better in attempting to assert liability against the County based on claims of an allegedly unconstitutional practice, policy or custom. (Compl. at ¶¶ 44–55, 8–9). In essence, Anderson is challenging Sheriff Jones' failure to prevent his officers' alleged non-compliance with intake procedures. In attempting to establish an unconstitutional practice by *inaction* (i.e., Sheriff Jones' failure to monitor) a plaintiff must show:

> (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the municipality; (3) the municipality's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the municipality's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Stewart v. City of Memphis*, 788 F. App'x 341, 346–47 (6th Cir. 2019) (citing *Thomas*, 398 F.3d at 429; *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

The reason such showings are necessary is because not only is "the *Monell* custom requirement … an essential element of this claim," but the "evidence must show that the need to act is so obvious" that the "conscious decision not to act" amounts to a "policy of deliberate indifference" toward Anderson's constitutional rights. *Doe*, 103 F.3d at 508. And, in *this* context, deliberate indifference "does not mean a collection of sloppy, or even reckless oversights; it means evidence showing an obvious, deliberate indifference [to rights.]" *Id.* at 508. "The occasional negligent administration of an otherwise sound policy is not sufficient to impose municipal liability." *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012). "*Doe* makes clear that the plaintiff bears a heavy burden in proving municipal liability, and he cannot rely solely on a single instance to infer a policy of deliberate indifference." *Thomas,* 398 F.3d at 433.

Like above, Anderson does not put forward any evidence indicating a pattern of rights violations that would have given notice or constructive notice to the Sheriff. While Berg claims a number of the officers failed to follow all details of the prison policies in their dealing with Payne, in doing so he makes no mention of, and certainly offers no facts showing, an established pattern of similar misconduct in dealing with inmates generally. (*See generally* Berg. Aff.). That is, Berg does not note any "pattern" of improperly classifying inmates at the Jail, any other prisoner assaults based on misclassification, or anything else which could be reasonably construed as giving rise

to a "pattern." Rather, Berg says "[i]n addition to failing to follow its own policies … Butler County Jail officials also failed to comply with the State of Ohio, Department of Rehabilitation and Correction, Standards for Jails in Ohio, Full Service and Minimum Security Jails *as it relates to Mr. Payne.*" (Berg. Aff. at ¶ 47, #1064–65) (emphasis added). He then continues to identify various shortcomings by the BCSO, but again only as they relate to their handing of Payne. (*Id.* at ¶ 48–53, #1065). In doing so, Berg points to no knowledge on the part of, let alone tacit approval by, Sheriff Jones regarding those shortcomings.

Based on the facts before this Court, the singular instance of Payne's incarceration and assault on Anderson is insufficient to establish a pattern that could give rise to a finding of deliberate indifference. Moreover, the assault does not show actual notice, constructive notice, or tacit approval of any "pattern," by Sheriff Jones. Finally, Anderson also has failed to show any causal link, let alone a direct one, between any pattern of misconduct at the Jail and the deprivation of Anderson's rights. As Anderson cannot show a single required element to substantiate this claim, summary judgment is appropriate in favor of Sheriff Jones.

### c. Sheriff Jones is Entitled to Summary Judgment on Anderson's Inadequate Supervision Claim.

Similarly, Anderson cannot prevail on his inadequate supervision claim against Sheriff Jones. "The Sixth Circuit has recognized that a failure-to-supervise claim that is distinct from a failure-to-train claim is uncommon." *H.M. v. Bd. of Educ. of the Kings Local Sch. Dist.*, 117 F. Supp. 3d 992, 1010 (S.D. Ohio 2015). "'This failure to supervise theory of municipal liability is a rare one. Most agree that it exists and

some allege they have seen it, but few actual specimens have been proved.'" *Id.* (quoting *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010)).

One factor that contributes to failure to supervise being so rare is that "[a] prerequisite to liability is that a constitutional violation has occurred." *McDougald v. Esham*, No. 1:16-cv-497, 2018 WL 1010214, at *12 (S.D. Ohio Feb. 21, 2018) (quoting *Watson v. City of Marysville*, No. 12-3478, 2013 WL 1224089, at *3 (6th Cir. Mar. 26, 2013)). This prerequisite dooms Anderson's claim. As noted above, there is no underlying rights violation here, meaning Sheriff Jones is entitled to summary judgment on this claim. *See McQueen v. Beecher Comm. Schs.*, 443 F.3d 460, 470 (6th Cir. 2006) (noting "a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor").

Moreover, even if Anderson's rights had been violated, he still could not hold Sheriff Jones liable on a failure-to-supervise theory. To start, Sheriff Jones cannot be held liable under a *respondeat superior* theory for the constitutional violations committed by subordinates. *See Monell*, 436 U.S. at 691. Accordingly, "[e]ven if a plaintiff can prove a violation of his constitutional rights, his § 1983 claim must fail against a supervisory official unless the supervisor encouraged the specific incident of misconduct or in some way directly participated in it." *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010). Encouraging misconduct requires, at a minimum, implicitly authorizing, approving, or knowingly acquiescing in "the unconstitutional conduct of the offending officers." *Hays v. Jefferson Cty.*, 668 F.2d 869, 874 (6th Cir.), *cert. denied*, 459 U.S. 833 (1982). Merely the right to control an employee, or simple

awareness of the employee's misconduct, is not enough. *See McQueen*, 433 F.3d at 470 (citing *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845 (1984)).

Thus, to impose liability on Sheriff Jones, Anderson must show that Sheriff Jones either participated in or encouraged misconduct related to Payne's arrival, classification, housing assignment, or monitoring at the Jail. Here, the record shows none of that. There is no assertion that Sheriff Jones had direct involvement in Payne's booking, classification, housing assignment, or monitoring. Nor is there any indication Sheriff Jones implicitly "authorized, approved, or knowingly acquiesced" to any of the alleged misconduct by Officers Fryer or Combs. Thus, Sheriff Jones is also entitled to summary judgment on this claim.[7]

### 3. *Officer Fryer, Officer Combs, and Sheriff Jones are Entitled to Summary Judgment on the Intentional Infliction of Emotional Distress Claim.*

Last, and in some ways least, comes Anderson's effort to hold Sheriff Jones and Officers Combs and Fryer liable in their official and individual capacities on a state law claim for intentional infliction of emotional distress. To substantiate this claim, Anderson would be required to show each of the following elements: (1) the defendant

---

[7] Anderson's official-capacity inadequate supervision claim faces another hurdle. It is not clear that an inadequate supervision claim can be brought solely as an official-capacity claim. Because inadequate supervision claims turn on the supervisor's actual involvement by authorizing, approving, or knowingly acquiescing in the conduct, such claims are typically brought as individual claims, rather than (or at least in addition to) official-capacity claims. Thus, even if there were a viable inadequate supervision claim here, which there is not, Anderson likely would not be able to seek recompense from the County (i.e., an official-capacity claim) without also establishing individual liability against Jones on that same claim, which Anderson has not sought to do. Because this Court finds there is no viable claim, it need not explore the implications of this issue.

intended, knew, or should have known actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it exceeded "all possible bounds of decency" and is "considered completely intolerable in a civilized community"; (3) these actions proximately caused injury; and (4) the plaintiff suffered "severe mental anguish" as a result of this conduct. *Davis v. Butler Cty.*, 658 F. App'x 208, 215 (6th Cir. 2016) (citing *Lombardo v. Mahoney*, No. 92608, 2009 WL 3649997, at *1 (Ohio Ct. App. Nov. 5, 2009)). Thus, to escape summary judgment, Anderson must show that there is a genuine dispute of fact as to each of these elements.

He fails to do so. Anderson's claim is based on his bare assertion that the defendants "knowingly violated Anderson's Eighth Amendment rights through the extreme and outrageous actions described above." (Pl.'s Resp. to Defs.' Mot. for Summ. J. at #1220; Compl. at ¶¶ 70–72, #11). The references to "extreme and outrageous actions" are conclusory statements which lack factual support. Coupled with the fact there are no underlying constitutional violations, this claim too is ripe for summary judgment. The conduct at issue here includes things like Officer Fryer's failure to fully document information in Vision Jail, Officer Combs' alleged failure to meticulously abide by the forty-minute rounds rule (a failure that, even if substantiated, appears to have no causal relationship to the injury that Anderson suffered), and the unsubstantiated allegations of a failure to train. The notion that any of these events, whether considered alone or in combination, somehow amount to conduct "completely intolerable in a civilized society" fails on its face.

There appears to be little doubt that Anderson suffered traumatic injuries as a result of Payne's attack. That is horrible. But the fact remains that neither corrections officers, nor those who hire and train them, are insurers of inmate safety in prison environments. To be sure, corrections officers have a duty to act reasonably in protecting those in their care. But here, the undisputed facts show that Officers Fryer and Combs acted reasonably on the information that was available to them, and certainly did not intentionally act to cause Anderson harm—emotional or otherwise. It is also undisputed Sheriff Jones was never directly or indirectly involved in any decisions involving Payne or Anderson, thus he could not have intentionally acted to cause Anderson harm either. Accordingly, the Defendants are entitled to summary judgment on this final claim as well.

## IV. CONCLUSION

Based on the foregoing, this Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 44) and **SUSTAINS in PART** and **OVERRULES in PART** Defendants' Objection. (Doc. 48). The Clerk is **DIRECTED** to enter judgment accordingly.

**SO ORDERED.**

February 19, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**